UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| JOSEPH SYLVESTER, ET AL | CIVIL ACTION NO. 22-5192 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| TALOS ENERGY OFFSHORE, LLC, ET AL | MAGISTRATE JUDGE WHITEHURST |

**MEMORANDUM RULING**

Before the Court is a Motion to Exclude/Motion to Strike Opinions of Dr. Chad Domangue ("Dr. Domangue") filed by Plaintiffs Joseph Sylvester ("Mr. Sylvester") and Melinda Sylvester (collectively, "Plaintiffs"). See Record Document 56. More specifically, Plaintiffs seek an order prohibiting Dr. Domangue from offering any opinions or testimony at the trial of this matter, prohibiting all parties and witnesses from making any reference to him, his report, and his opinions at trial, and/or striking certain opinions of Dr. Domangue as they relate to his opinions on vascular issues. See id. at 2. Plaintiffs contend that Dr. Domangue's opinions exceed the scope of his expertise as he has no experience or expertise in vascular surgery and/or diagnosing and treating vascular conditions. See id. Defendants Talos Energy Offshore, LLC, Talos Energy, LLC, Talos ERT, LLC, Rodi Marine, L.L.C., Rodi Marine Management, LLC, Wood Group PSN Inc., and XYZ Insurance Company (collectively, "Defendants") oppose the motion. See Record Document 71. For the reasons set forth below, Plaintiffs' motion (Record Document 56) is **DENIED**.

**BACKGROUND**

This is a maritime negligence case that arises out of an accident involving Mr. Sylvester that allegedly occurred on September 23, 2021. In 2021, Talos was the operator

of the South Marsh Island 130 ("SMI 130") field, located in the Gulf of Mexico on the Outer Continental Shelf. See Record Document 53-3 (Declaration of Lonnie Smith) at 1. Talos's SMI 130 field consists of several oil and gas production platforms. See id.

Mr. Sylvester was employed as a crane mechanic by Gulf Crane Services, Inc. ("GCS"). See Record Document 1 at 3; Record Document 55-4 (Declaration of Shane Theunissen) at 2. Between April 2021 and October 2021, Mr. Sylvester was assigned to work for Talos on Talos's offshore production platforms in SM1130 field. See Record Document 55-5 (Deposition of Joseph Sylvester) at 7. On the date of the accident, Mr. Sylvester claims that he sustained personal injuries at approximately 9:30 a.m. while being transferred in a personnel basket from the M/V MISS PEGGY ANN ("the vessel") to Tabs's SMI 130 platform. See Record Document 1 at 2-6. He claims that when the crane operator, Brian Spears ("Spears"), lifted him in the basket, the basket swung rapidly causing it and Mr. Sylvester to "slam violently" into a Connex box that was on the deck of the vessel. Id. Mr. Sylvester contends that the negligent operation of the SMI 130 platform crane by Spears caused or contributed to his injuries. See Record Document 1 at 11.

As a result of the incident, Mr. Sylvester sustained serious injuries, including injuries to his hip, back, and legs. See Record Document 56-1 at 4. He suffered severe pain and swilling in his hip, thigh and leg and was diagnosed with a blood clot. See id. In October 2021, Mr. Sylvester was diagnosed with deep vein thrombosis ("DVT"). See Record Document 71 at 2. He underwent a surgical procedure to remove those blood clots and was placed on two powerful blood thinners to prevent the recurrence of blood clots. See id. Thereafter, he complained of low back pain. See id. In June 2022, he underwent a lumbar fusion to relieve this pain. See id. Despite undergoing these two

surgeries and taking medication, his leg pain got worse. See id. In February 2023, Mr. Sylvester underwent an ultrasound which showed new blood clots in his left leg that caused swelling and severe pain. See id.

Defendants retained Dr. Domangue as an expert in the fields of neurology and pain management. See Record Document 56-1 at 5. At the request of Defendants, Dr. Domangue was asked to conduct a physical examination of Mr. Sylvester, review his medical records, and determine why, after all the treatment he has received, he continues to suffer from severe leg pain. See Record Document 71 at 2. After conducting his examination, Dr. Domangue stated, "'[i]t is my medical opinion that all of his [Joseph Sylvester's] symptoms are related to his vascular abnormalities and not his lumbar spine.'" See Record Document 56-1 at 6 (Dr. Domangue report, p. 44; Exhibit 3). Plaintiffs contend that this statement, along with others, exceeds the scope of Dr. Domangue's expertise. See id. at 8.

## LAW AND ANALYSIS

**I.  Federal Rule of Evidence 702 and Daubert standard.**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

>    (d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993). The Daubert holding provided an illustrative list of factors that courts may use when evaluating the reliability of expert testimony. See id. at 592–594. These factors include whether the expert's theory or technique can be or has been tested, whether it has been subjected to peer review, whether it has a known or potential rate of error or standards controlling its operation, and whether it is generally accepted in the relevant scientific community. See id. at 593–594. "In short, expert testimony is admissible only if it is both relevant and reliable." Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002). Thus, the Daubert factors should be applied with flexibility and the question of whether an expert's testimony is reliable is ultimately a fact-specific inquiry. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 138, 119 S. Ct. 1167, 1170 (1999); Burleson v. Tex. Dep't of Criminal Justice, 393 F.3d 577, 584 (5th Cir. 2004).

Though the trial court must fulfill its role as gatekeeper in ensuring that all admitted expert testimony is both reliable and relevant, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." U.S. v. 14.38 Acres of Land, 80 F.3d 1074, 1078 (5th Cir. 1996). Thus, "[t]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's note (2000). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction

4

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. The proponent of an expert's testimony bears the burden of proving that it meets the requirements of Rule 702. See Moore v. Ashland Chem., Inc., 151 F. 3d 269, 276 (5th Cir. 1998). Whether these elements are met is a preliminary question for the district court to decide under Federal Rule of Evidence 104(a).

**II.  Analysis.**

Plaintiffs make several arguments under Daubert and Rule 702. See Record Document 56-1 at 11–14. Dr. Domangue's vascular opinions are unreliable for the following reasons: (1) they are unsupported by any specialized knowledge that will help the trier of fact understand the evidence or an issue; (2) they are not based on sufficient facts or data; (3) they are unsupported by reliable principles and methodology; and (4) there is no evidence to suggest his opinions satisfy the reliability factor. See id. at 11–13. Plaintiffs argue that Dr. Domangue's most glaring failure in this regard is that he failed to consider the opinions of Dr. Christopher LaGraize ("Dr. LaGraize"), the Defendants' vascular expert. See id. at 13.

In the opposition, Defendants argue that Plaintiffs misunderstand the fields of neurology and pain management and the sound methodology Dr. Domangue used in forming his opinions in this case. See Record Document 71 at 2. Physicians, like Dr. Domangue, who specialize in neurology and pain management are routinely called upon to create a differential diagnosis to determine if a patient's vascular conditions are the cause of, or a contributor to, their complaints of pain, physical limitations, or other symptoms. See id. at 3.

In Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C., the Fifth Circuit held that "'[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility.'" 753 Fed. Appx. 191, 195 (5th Cir. 2018). Additionally, "'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications.'" Id. In Cedar Lodge, the environmental expert had expertise "related to the resolution of hazardous waste matters for commercial and industrial facilities, rather than sewage systems for apartment complexes or multi-family residential communities." Id. Nevertheless, the expert's testimony on areas he was not specialized in did not "render his testimony unreliable." Id. at 196.

Similarly, in Parker v. John W. Stone Oil Distributors, L.L.C., the plaintiff filed a motion to exclude an expert from testifying about material that exceeded the scope of his expertise and was irrelevant. No. 18-3666, 2019 WL 5212285, at *4 (E.D. La. Oct. 16, 2019). The expert was an ENT who gave a causation opinion about whether multiple sclerosis caused the plaintiff's symptoms. See id. The district court denied the plaintiff's motion to exclude the expert's testimony. See id. The court reasoned that "it seems axiomatic that an attending physician would consider alternate explanations for a patient's symptoms." Id. Additionally, "[c]ourts in and around this district have sometimes allowed the testimony of medical experts to reference areas outside of one's particular expertise." Id. See, e.g., Harmeyer v. Dohm, No. 06-4220, 2007 WL 4294667, at *5 (E.D. La. Mar. 7, 2007) (allowing a neurosurgeon to testify as to knee pain); Bowie v. Am. Home Assur. Co., No. 05-1381-JJB, 2009 WL 3254500, at *2 (M.D. La. June 3, 2009) (allowing a spine surgeon to testify "on all areas of orthopedics" including knee injuries).

In the instant case, Dr. Domangue is an expert specialized in the fields of neurology and pain management. However, as it relates to a causation opinion to consider alternate explanations for Mr. Sylvester's symptoms, Dr. Domangue's opinion on vascular issues being a potential causal factor in the prolonged pain is proper. It makes sense for an attending physician, like Dr. Domangue, to consider a vascular abnormality explaining Mr. Sylvester's ongoing symptoms and swelling. See Record Document 71 at 11.

Plaintiffs maintain that Dr. Domangue is not qualified to render an opinion on vascular issues and has no medical or factual support for his opinions. See Record Document 56-1 at 6. In In re Vioxx Products Liab. Litig., the defendant's expert in prostrate pathology was able to opine in the case, which involved cardiovascular pathology. 401 F. Supp. 2d 565, 576 (E.D. La. 2005). The district court found that the expert had "numerous credentials and experience in the field of pathology." Id. Furthermore, "[t]he [p]laintiff's attack [was] fodder for cross-examination, not grounds to exclude [the expert] from testifying at all." Id. The expert's methodology involved reviewing autopsy slides, medical records, expert reports, and depositions. Id. This methodology, combined with the expert's training and experience, rendered the expert qualified to opine in the case. Id.

In the instant case, Plaintiffs assert that Dr. Domangue is not qualified to give an opinion regarding vascular issues. See Record Document 71 at 15. Defendants argue, however, that Dr. Domangue is well qualified to evaluate whether vascular conditions are causing symptoms, pain, or limitations to his patients. See id. at 8. The Court agrees. Dr. Domangue participated in an internship program at the Medical Center of South Carolina, Charleston, South Carolina. See id. The first year of the program was internal medicine, which included training in vascular issues. See id. Additionally, from 2005 to 2007, Dr.

Domangue was a resident in the neurology department at the University of Virginia, where he participated in and was trained in the stroke program. See id. In this program, he received specific training in the diagnosis and care of vascular conditions. See id.

Moreover, in his report, Dr. Domangue reviewed Mr. Sylvester's medical records, including imaging studies and narrative records. See id. at 10. Dr. Domangue went through Mr. Sylvester's physical examination, and then based upon a differential diagnosis, offered his opinions. See id. Similar to the expert in In re Vioxx Products, Dr. Domangue has training involving vascular conditions, as it relates to neurology and pain management and has reviewed a variety of materials before preparing his opinion.

Dr. Domangue's opinions are based upon the differential diagnosis he created, which Defendants argue is a reliable methodology. A differential diagnosis "is 'a patient-specific process of elimination that medical practitioners use to identity the "most likely" cause of a set of signs and symptoms from a list of possible causes.'" Pick v. Am. Med. Sys., Inc., 958 F. Supp. 1151, 1162–63 (E.D. La. 1997) (quoting Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1413 (D. Or. 1996)). When conducting a differential diagnosis, "[t]he physician should consider the history of the patient's symptoms, review his outside records, conduct a physical examination and laboratory testing, then evaluate all the possible causes of the condition, based on his medical training and available information, ultimately selecting a diagnosis which best fits all the findings." Id. at 1163. In Pick, the district court stated that it, along with several other courts, hold that a differential diagnosis meets Daubert. Id.

However, the Fifth Circuit "has cautioned that 'the results of a differential diagnosis are far from reliable per se.'" Sims v. Kia Motors of Am., Inc., 839 F. 3d 393, 401 (5th Cir.

8

2016). This holding does not mean that a differential diagnosis can never meet the Daubert standard; rather, "the district court has broad discretion to make the fact-specific inquiry in a given case as to whether such an approach is sufficiently reliable, especially in the absence of evidence 'ruling in' an expert's conclusion." Id. at 402. Additionally, if an expert is conducting a differential diagnosis to rule out certain causes of the injury, he must additionally rule in the suspected cause using scientifically valid methodology. Harris v. Stryker Spine, 39 F. Supp. 3d 846, 853 (S.D. Miss. 2014); see Sims v. Kia Motors of Am., Inc., 839 F. 3d at 402–03.

In the instant case, Dr. Domangue explains that as a neurologist and pain management physician, he is called upon to evaluate the presence and effect of vascular conditions on his patients and determine whether those conditions are the cause of, or a contributor to, a patient's complaints of pain, physical limitations, or other symptoms. See Record Document 71 at 14–15. Dr. Domangue does not suggest treatment for Mr. Sylvester's blood cloths; rather, he only diagnoses the worsening venous issues as the source of the pain. See id. at 15. After starting with a physical examination, medical history, and imaging studies, Dr. Domangue ruled out a lumbar injury as a cause of the clotting because it did not fit the data. See id. at 16. Therefore, Dr. Domangue ruled in vascular issues as being a potential cause of Mr. Sylvester's clotting, which is proper under case law. See id.

Another argument by Plaintiffs asserts that Defendants' vascular expert, Dr. LaGraize, put forth an opinion that completely contradicts Dr. Domangue's opinions on the vascular issues. See Record Document 56-1 at 5. However, Dr. LaGraize was not asked to perform a physical examination of Mr. Sylvester, review the extensive number

9

of records, and create a differential diagnosis explaining the source of the continued pain. See Record Document 71 at 21. Dr. LaGraize and Dr. Domangue were asked to give separate opinions, so their opinions should not be compared against one another.

## CONCLUSION

Based on the foregoing analysis, this Court finds that there are no sufficient grounds to exclude or strike Dr. Domangue's opinions. Plaintiffs' attack is better suited during cross-examination. Accordingly, Plaintiffs' Motion to Exclude/Motion to Strike Opinions of Dr. Chad Domangue (Record Document 56) shall be **DENIED**.

An order consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 25th day of September, 2024.

_____
United States District Judge